[Civ. No. 10829. First Appellate District, Division Two.—October 20, 1938.]

LELAND HIGGINS et al., Appellants, v. FRANK D. MONCKTON et al., Respondents.

Carroll Single and Stanley J. Cook for Appellants.

Courtney L. Moore, Morgan C. Lombardi, Keyes & Erskine, Charles K. Harper, Tinning & DeLap, W. H. Metson, P. H. McCarthy, Jr., A. T. Bridgett, Robinson, Price & MacDonald, Calkins, Hagar, Hall & Linforth, John U. Calkins, Jr., and A. H. Conard for Respondents.

NOURSE, P. J.—The plaintiffs sued to recover damages aggregating $148,500 alleged to have arisen from the breaking of a levee during the high water period of February, 1936. The three plaintiffs are separate copartnerships each of which holds under a lease from the defendants J. C. Franks Estate Company and the individual defendants comprising that company. The defendants are all the owners of the entire tract of land comprising an island of about 4,000 acres in the delta region in the old river and slough section of Contra Costa County. These defendants fall into three distinct classes: the lessors, under whom plaintiffs hold, the land-owners who were not lessors, and the trustees for all the land-owners under the contract of 1902, hereinafter referred to. Six groups of these defendants appeared separately and demurred. Their demurrers to the amended complaint were sustained without leave to amend. From the judgment following that order the plaintiffs have appealed. The several groups of defendants have separately briefed their demurrers, each urging separate grounds for the affirmance of the judgment and adopting the grounds urged by the others.

The pertinent portions of the allegations of the complaint are that, in September, 1902, seven persons, who were tenants in common of the entire island, entered into a contract to form an unincorporated private association to reclaim the island by draining it and erecting and maintaining levees around it; the owners were authorized to elect three trustees to act as their agents for the purpose of prosecuting the work of reclamation and of maintaining the levees. Each owner obligated himself to pay his proportionate share of the cost and expenses. It was agreed that the tract should be partitioned among the tenants in common by cross-deeds, and that the contract and the covenants should run with and be a perpetual burden upon the lands of the several parties, and their successors in interest, and should be binding upon them as such. Following the execution and recordation of this contract, the land was partitioned among the seven owners and cross-deeds were duly executed and recorded in the year 1905. These deeds all adopted and made permanent the covenants of the contract of 1902. Each of the plaintiff partnerships was farming a separate tract of land under a written lease exe-

cuted by the Franks Estate, owner of one of the seven parcels of land resulting from the subdivision made in 1905. On February 23, 1936, the levee broke when the river surrounding the island was "high with rain and melted snow from the mountains", and inundated the land leased by these plaintiffs, destroying a large crop of asparagus.

One feature of these leases, which is common to all three, though expressed in different terms, is that the lessees agreed not to hold the lessors liable for any damages caused by flood or high water, or caused by the performance or failure to perform any reclamation or levee work. The Vengley Brothers' lease makes an exception to this release if the damage is caused by the lessor "in construction or reconstruction of dikes or levees".

The plaintiffs have pleaded their case in six separate causes of action—one each on the alleged breach of the covenants of the contracts, and one each in tort for the alleged negligence in the performance of the duty which the plaintiffs claim the defendants owed them under those contracts.

In disposing of the appeal we will eliminate from our discussion all but two of the points raised by the several groups of defendants, because those two points go directly to the merits of the controversy and should put an end to the litigation. These are the effect and extent of the covenants of the contracts of 1902 and 1905, and the effect and extent of the releases by the several lessees.

On the first point the rights of the parties are statutory. Section 1460 of the Civil Code provides: "Certain covenants, contained in grants of estates in real property, are appurtenant to such estates, and pass with them, so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee, in the same manner as if they had personally entered into them. Such covenants are said to run with the land." We may pass the question argued by one group of respondents that the covenants here involved are not "contained in grants of estates" and, hence, do not run with the land. We may assume for the purpose of the decision that they are covenants running with the land within the meaning of sections 1460, 1462, 1464 and 1468 of the Civil Code. The vital issue is whether they are such covenants as would inure to the benefit of, and become enforceable by, one who

is a mere lessee of one who is both a covenantor and a covenantee. By the clear language of section 1460, covenants running with the land bind the assigns of the covenantor and vest in the assigns of the covenantee. By the terms of the contracts here involved, we have a case of mutual covenants, wherein each covenantor is also a covenantee—each binding himself to the burdens upon his own land as a covenantor to the other six owners as covenantees, and each taking to himself, as a vestiture in his land, the benefits as a covenantee of the burdens assumed by the other grantors. It is a settled rule of law that he who seeks the benefits of a contract must also assume the burdens, but section 1465 of the Civil Code expressly declares that: ''A covenant running with the land binds those only who acquire the whole estate of the covenantor in some part of the property.'' It is not disputed here that the lessees are not subject to the burdens of these covenants except to the limited extent to which they agreed in the leases to furnish men and equipment to their lessors for work on the levees when demand therefor was made upon them by their lessors. This is not an assumption of the burdens of the covenants. It is but a private obligation between the lessors and the lessees. It must be granted that these covenants were not made for the benefit of the lessees and that they cannot sue on the theory that they were ''third parties'' for whom the contracts were made. Their case on the covenants rests squarely on the theory that they are ''assigns'' of either the covenantor or of the covenantee.

On this question the weight of the authorities is against the appellants. In 5 C. J., pages 842, 843, it is said: ''A lease is not an assignment, and differs from an assignment in this: By a lease one transfers or grants an interest less than his own, reserving to himself a reversion; by an assignment the assignor parts with the whole property and the assignee stands, to all intents and purposes, in the place of the assignor. The same distinction exists between the assignment of a lease and a subletting.'' The statement in the text that a lessee acquires but a limited portion of the entire estate finds expression in *Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal. (2d) 232, 242, 243 [73 Pac. (2d) 1163], where it was held that there was no privity between a sublessee and the original lessor which

would entitle the former to sue for breach of covenants in the parent lease; that covenants running with the land bind only those who have acquired the whole estate of the covenantor in some part of the property. To the same effect are *Ericksen* v. *Rhee*, 181 Cal. 562, 567 [185 Pac. 847]; *Handleman* v. *Pickerill*, 84 Cal. App. 214, 218 [257 Pac. 890]; *Smiley* v. *Van Winkle*, 6 Cal. 605, 606; *Jeffers* v. *Easton, Eldridge & Co.*, 113 Cal. 345, 351 [45 Pac. 680]; *Cross* v. *Bouck*, 175 Cal. 253, 256 [165 Pac. 702]; *Stevinson* v. *Joy*, 164 Cal. 279, 286 [128 Pac. 751]. In the last case the court stated that the distinction between an assignment and a subletting is well recognized, and that a covenant against an assignment would not embrace a subletting.

Appellants rely upon authorities from other jurisdictions and particularly on *Brockmeyer* v. *Sanitary Dist.*, 118 Ill. App. 49, which holds that "in common parlance", the word assignments signifies the "transfer" of all kinds of property and that a lessee must therefore be deemed a transferee or assignee. These loose applications of legal language are of no aid in view of the accepted use of the terms in our Civil Code, as adopted and applied in the authorities of this state. We conclude from the foregoing that the appellants are not privies to the covenants of the contracts and may not, therefore, sue upon them.

These views are fortified by the following observations showing the necessary application of the rule to this case. The covenants are mutual and self-serving. They bind one and all of the covenantors and the covenantees. They expressly declare that they should be binding upon all of the parties thereto "and their successors in interest" and that they shall be "a perpetual burden upon the lands of the several parties hereto". The "burden" is the contribution from the landowner of his proportionate share of the assessments levied for work and maintenance of the levees. It should be noted that no one of the lessees assumed the burden to maintain or repair the levees, that the whole purpose of the original contracts was to reclaim these lands at the mutual expense of the landowners, that the contracts do not contemplate insurance of the land against loss from flood waters, and that the selection of trustees to conduct the actual work of construction does not add to or subtract from the mutual

burdens and obligations of the several covenantors. Furthermore, the covenants being mutual, and the trustees being the agents of all, any breach of the trustees becomes the breach of all the covenantors. Hence, no one landowner could sue for a failure to maintain the levees because he was at fault as well as the other landowners. Though a suit to enforce the obligation to contribute to the expense might lie against one in default, a suit for breach of a contract obligation in which the plaintiff joined with all the defendants in committing the breach would not lie under any theory. Thus, the situation so far as these appellants are concerned in reference to the causes of action for breach of contract is this: If they are not "assigns" under the meaning of the code section they have no privity of contract and no capacity to sue herein; if they are "assigns" then they took the "estate" of their lessor in reference to the covenants, are mutual covenantors and covenantees with the other landowners, and may not sue for damages caused by their own breach.

The demurrers to the second, fourth and sixth causes of action, which rest on charges of negligence—or negligent failure to perform contract obligations—raise many varied points, but we will confine our discussion to the effect of the waiver as to the lessors, and the application of the waivers to the other landowners and to the trustees.

In so far as the lessors are concerned, the appellants have in plain language released them from all liability and waived any right that they might have as assigns under the covenants. The Higgins & Lacy lease provides that the lessor shall not be responsible "for any damage resulting from the overflow of said land from any cause whatsoever or for any damages resulting from the failure of water to irrigate said land, or from a failure to drain said land resulting from any cause whatsoever"; that "The lessee waives all damage caused or suffered by any act committed or omitted by the lessor or any of its tenants with respect of or in anywise relating to the drainage or irrigation of the demised land or any land in said Frank's Tract." That the lessor agrees "to at all times favor and support any repairs by way of heightening and reinforcing the levees and reclamation works of said Frank's Reclamation Tract

that may at any time during the term of this lease be deemed and decided to be necessary by said trustees, in their discretion, to protect the said Frank's Reclamation Tract and incidentally the said demised premises from over-flow of flood waters. That the lessee shall not claim or have any damages or right to claim damages by reason of any reclamation or levee work which may in any way affect the demised premises *or by reason of the failure to perform any of said work.*"

The Alibangbang lease provides: "In case high water shall threaten the levee, on the reclamation tract of which said premises are a part, the Lessees promise and agree to furnish, without charge, any and all men and teams at their disposal to aid in preventing said high water from injuring said levee. In case of a flood or high water no liability for damages caused by said flood or high water shall attach or arise on the part of the said Lessors. . . ."

In the Vengley lease the lessees agreed to use all diligence to preserve and protect the levees and to furnish all men and teams at their disposal to aid in preventing high water injuring the levees. They expressly accepted the land and improvements then on the premises and released the lessor from any responsibility in any sum for the land being too wet or too dry. This lease further provided that: "The Lessees also agree not to hold the Lessor liable for any damage by flood no matter how same may be caused, unless damage be occasioned by an act of the Lessor in construction or reconstruction of dikes or levees."

These clauses quoted from the three leases have a double application and significance. They are in plain and unequivocal language complete releases of all claims for damages against the lessor arising out of poor construction or poor maintenance of the levees, and they are at the same time full waivers of any legal claim or right of action based upon the covenants of the contracts of 1902 and 1905. All the leases show plainly that the lessees took their several tracts of land in full contemplation of the dangers from high and flood waters in the period of heavy rainfall. It is a matter of common knowledge, and one of which the courts of this state may take judicial cognizance, that in the month of February heavy rains and melting snows in the mountains cause these rivers to overflow their banks and that the islands

in the sloughs of the delta section frequently and commonly are in danger from these high flood waters. The lessees disclosed their knowledge of these conditions when they expressly waived claims for damages arising from such source. The amended complaint alleges that the damage to the lands under lease was caused where the levees gave way due to the "high waters prevailing in the latter portion of February, 1936", and that the rivers and sloughs were then "high with rain and melted snow from the mountains". The appellants thus lay the source of their damage to the very factor which they inserted in their waivers and releases. This eliminates all those defendants who are sued either directly as lessors or indirectly as those holding under them. (*Stephens* v. *Southern Pac. Co.*, 109 Cal. 86, 94 [41 Pac. 783, 50 Am. St. Rep. 17, 29 L. R. A. 751]; *Inglis* v. *Garland*, 19 Cal. App. (2d) (Supp.) 767, 770 [64 Pac. (2d) 501].)

The question of the effect of these releases upon the causes of action for negligence pleaded against the remaining landowners and the trustees, as agents of such landowners, is covered by these general principles:

(1) Negligence is the breach or omission of a legal duty, and to warrant an action based on negligence "there must exist some obligation toward the plaintiff which defendant has left undischarged". (*Jacobson* v. *Northwestern Pac. R. R. Co.*, 175 Cal. 468, 472 [166 Pac. 3].)

(2) The rights and duties of the landowners were mutual. They enjoyed the right to reclaim and protect their land in the manner alleged. "The proprietor of land so threatened (by flood waters) can ward off the danger by suitable obstruction to the invasion of his land at any point upon his own premises, and by any means that does not go beyond the limits of a defensive act, and become an aggressive diversion of the natural flow upon other proprietors." (*Weinberg Co.* v. *Bixby*, 185 Cal. 87, 109 [196 Pac. 25, 35].) "The underlying principle governing the decision of all these cases which deal with extraordinary water conditions, whether created by the ocean or by unexpected and unprecedented floods, is that in such stress the landowner may use every reasonable precaution to avert injury from his land, and whether or not his conduct be reasonable will be determined by existing conditions and not by after consequences; so

that if the acts of the landowner be, in the light of the existing circumstances, not unreasonable he will not be held liable for consequent damage which by these reasonable acts may be inflicted upon another landowner." (*Jones* v. *California Dev. Co.,* 173 Cal. 565, 574 [160 Pac. 823, 827, L. R. A. 1917C, 1021].) It was the undoubted right of the landowners to erect levees or dikes to protect their property from flood waters, but it is settled law that they were under no duty or obligation to maintain them. (*Weinberg Co.* v. *Bixby, supra,* p. 101.) The right to repel flood waters is purely one of self-defense. These waters are viewed as a common enemy against which the landowner may protect himself without commission of wrong. (*Gray* v. *McWilliams,* 98 Cal. 157, 163 [32 Pac. 976, 35 Am. St. Rep. 163, 21 L. R. A. 593].)

These are the principles which the landowners here embodied in their contracts of 1902 and 1905. They united for a common purpose—the control of these flood waters for their mutual benefit. They obligated themselves each to pay his proportionate share of the assessments made necessary for the cost of the construction and maintenance of the levees, and authorized their trustees to do all things needful for the protection of the land against flood waters and to make and keep said lands susceptible of cultivation. This was the limit of their obligations—to pay the costs. They assumed no duty to fight the common enemy and reserved no right in themselves to sue among themselves for failure of anyone to maintain the levees. The only obligation which they could enforce, the one against the other, was the obligation to pay the share of the cost of operations. Under these circumstances, there is no possibility of pleading a case of negligence against the individual landowner because of his failure to maintain the levees to the point of insuring protection against overflow upon the land of any other owner.

(3) Whether these landowners were liable for the failure of their trustees to maintain and repair, on the theory that they were the agents of the owners, depends upon these principles. If the landowner had no duty to maintain the levees, his agent was not negligent in failing to do so. The Weinberg case is authority for the statement that the landowner did not have such duty. If the trustees were obligated

to take all necessary steps to prevent harm, they assumed a duty independent of their position as landowners, and their individual liability is to be determined on these considerations—did they assume the duty of doing all things necessary or merely of doing what they thought was sound and reasonable. The terms of the contracts plainly disclose that it was not the intention of the parties to impose upon the trustees the duty of maintaining perfect flood control, but that it was the intention to give to them the power to do what they deemed necessary and reasonable. The trustees' duties and liabilities are governed by the well-settled rule in this state that "the liability of one who installs, maintains or operates structures to protect his property against flood waters depends on whether the acts of the owner of such structures were reasonable under the circumstances". (*Wade* v. *Thorsen*, 5 Cal. App. (2d) 706, 709 [43 Pac. (2d) 592]; *Jones* v. *California Dev. Co., supra*, p. 576.) The reasonableness of the acts of the trustees is not put in issue by any allegation of the complaint. The single theory upon which the case of negligence is pleaded is that the trustees were in duty bound to so construct, repair, and maintain the levees as to protect appellants from all danger and damage from the flood waters.

In some of the briefs, these waivers or releases are treated as releases of joint tort-feasors, and it is argued that, as such, they release all the landowners. Sufficient consideration therefor is shown in the written leases. Other counsel argued that they are covenants not to sue. To these arguments the appellants reply that there was no consideration and no tort committed at the time the releases were executed. We will not attempt to solve this controversy. The dilemma is with the appellants who are seeking to plead a case. ▆▆▆ It is sufficient to say that, if they are assigns of their immediate lessors, they take the covenants of the contracts with the obligations as well as the benefits. Taking the obligations of the covenants, it became their duty to do unto the other covenantees what they would ask the others to do unto them. Thus, if each landowner was obligated under the covenants to insure the effective maintenance of the levees against loss to all other covenantees, then the appellants were under the same obligations to the others. Under these circumstances

the appellants were themselves joint tort-feasors and as such are suing to recover for their own wrong.

■ If they are not assignees under the covenants, and the releases are merely covenants not to sue their immediate lessors, then they effectively put an end to this litigation in so far as such lessors are concerned. But Mr. Franks, one of these lessors, was also one of the three trustees chosen by all the landowners to supervise and conduct all operations for the construction and maintenance of the levees. The lessees covenanted not to sue him as trustee, except for negligence in the construction of the levees. No such negligence is alleged. By thus releasing Mr. Franks they released the agent of all the other landowners and thus invited the negligence of which they now complain. There is no sounder principle of law than that which declares that one who sanctions and encourages the act of negligence may not recover for it.

■ Again, assuming that the lessees are not assignees under the covenants, and that no one of the landowners owed a duty to any other, or to anyone holding under him, to perpetually maintain the levees (*Weinberg Co.* v. *Bixby, supra*), then the second, fourth, and sixth causes of action must rest, not in tort for a negligent act, but for breach of the contract of the covenants. Under this theory appellants' case must fail for two reasons—they are not privies to the contracts containing the covenants and cannot sue for their breach; the covenants of the contracts do not require the covenantors to maintain the levees against all loss (*Weinberg Co.* v. *Bixby, supra*). This circle should end with the statement that the pleadings unmistakably disclose that the lessees took the property "as is", with full knowledge of the attending dangers of flood waters during the winter run-off, that they had the equal right, and the equal duty, to protect the land from these flood waters as that enjoyed or imposed upon the landowners, that in releasing these immediate lessors from damages caused by flood waters, they did so with full recognition of the want of liability of one landowner to the other, and with the full intention and purpose of placing themselves in the stead of their immediate lessors, in so far as concerned the right to claim such liability, or to demand the perpetual maintenance of the levees. By the plain terms of the con-

tracts of 1902 and 1905, the plan of reclamation was devised for the mutual benefit of the landowners, carrying their mutual burdens of the covenants. If all landowners agreed that the plan was no longer feasible, they were at liberty to abandon it. If, for that reason, the lands leased to these appellants became unsuitable for cultivation, they should have their remedy against the lessors. But such is not the case pleaded here.

The judgment is affirmed.

Sturtevant, J., and Spence, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 19, 1938.