Wayne KUNZ et al.,
Plaintiffs-Appellees,

v.

UTAH POWER AND LIGHT COMPA-
NY, a Maine Corporation,
Defendant-Appellant.

No. 74–1528.

United States Court of Appeals,
Ninth Circuit.

Nov. 17, 1975.

W. F. Merrill (argued), of Merrill & Merrill, Pocatello, Idaho, for defendant-appellant.

Robert C. Huntley, Jr., and Louis F. Racine, Jr. (both argued), of Racine, Huntley & Olson, Pocatello, Idaho, for plaintiffs-appellees.

## OPINION

Before KILKENNY, CHOY and GOODWIN, Circuit Judges.

CHOY, Circuit Judge:

Utah Power and Light Company (Utah Power), a Maine corporation, appeals from a judgment by the district court holding it liable for negligence in permitting flood damage to the property of appellees, various Idaho landowners (Landowners). We affirm.

### Background

Bear Lake lies on the border between Idaho and Utah. Bear River begins high in the Uinta Mountains of Utah, meanders back and forth between Utah and Wyoming, flows north some distance into Idaho, and finally turns south back into Utah, where it terminates in the Great Salt Lake. Bear River does not naturally enter Bear Lake, instead flowing past it a few miles to the north. In about 1917, however, the predecessor of Utah Power constructed Stewart Dam on the river, diverting its flow via canals into Mud Lake, which connects with Bear Lake. After the water reaches Bear Lake, it flows northward out of the lake, by gravity or through pumping, via an outlet canal to rejoin the old natural bed of Bear River some distance north of Stewart Dam. Between certain maximum and minimum limits (the height of the gates and the depth of the pumping intake facilities), Utah Power can control the flow out of Bear Lake, and it can close the lake so that the flow continues directly down the river. The use of Bear Lake for water storage is the central feature of the whole system. The dam, the canals, and the control facilities are located within Idaho.

Utah Power operates the system under the authority of various federal statutes, a 1920 federal district court decree, and more recently the Bear River Commis-

sion (established by the Bear River Compact, a joint effort of Idaho, Utah, and Wyoming). The explicit purposes for which Utah Power is commissioned to operate the system are, first, to store water for irrigation throughout the valley in Idaho and Utah below the Bear Lake facilities, and, second, to generate hydroelectric power. In addition, Utah Power has endeavored to use the facilities for flood control, particularly as to the spring runoffs of the watershed. Though this activity is not one of the specified purposes imposed by the authorizations, it is not precluded by them.

The Landowners are ranchers whose lands lie along the Bear River channel downstream from Bear Lake. Prior to 1917 these lands were devoted to orchard grasses and wild hays, which were dependent upon flooding from the natural spring runoffs to maintain their growth. The installation of the water storage system in 1917 harnessed the spring runoffs and stopped the flooding, so the ranchers converted their operations to alfalfa and cereal crops, which will not tolerate floods. Since the 1920's Utah Power has held flood easements on the property now held by two of the Landowners, Abel Kunz and Dean Kunz.

Because of heavy winter snows and spring rains, the spring runoff in 1971 was exceptionally large. About 2½ times the quantity of water of an average year was fed into the Bear River-Bear Lake system, an amount which the Landowners' expert witness described as "above anything else they had known in past history." The storage system failed to contain all of the runoff, and the Landowners' properties downstream were flooded for several months through the summer of 1971. Similar inundation occurred in 1972 when the watershed was fed double the average amount of water.

The Landowners brought an action for damages resulting from the flooding, contending that Utah Power had been negligent in its operation of the Bear River-Bear Lake storage system. Jurisdiction in the district court was based on the diversity of citizenship of the parties and the amount in controversy, pursuant to 28 U.S.C. § 1332. Upon stipulation of the parties, the trial court ordered a bifurcated trial, separating the issues of liability and damages. A jury trial on the issue of liability resulted in a verdict and judgment for the Landowners, from which Utah Power appeals. Permission to bring this interlocutory appeal under 28 U.S.C. § 1292(b) and F.R.App.P. 5 was granted by order of this Court dated March 28, 1974.

## Issues

Utah Power contends: (1) That it had no affirmative duty of flood control and so could not be held negligent for downstream flooding since it did not add to the natural flow of the river during the time in question. (2) That it cannot be negligent in failing to anticipate an unprecedented spring runoff. (3) That the Landowners' evidence, as a matter of law, was not sufficient to prove negligence. (4) That the trial court erred in applying the law regarding flood easements.

## Duty of Care

■ Before showing Utah Power to be negligent, the Landowners must first establish that Utah Power owed them a duty of care. The existence and nature of such a duty is a question of law for the court. The trial court here noted that these storage facilities "were not authorized for or intended for flood control purposes." Instruction 16. Nonetheless, the court ruled and instructed the jury that Utah Power "had a duty in this case to use all reasonable means in the operation of its water storage system at Bear Lake to avoid flooding the lands of the plaintiffs [Landowners]." Instruction 15.

Utah Power emphasizes that flood control was not one of the responsibilities for which it was commissioned to operate the Bear River-Bear Lake storage system. It acknowledges that it was required to exercise ordinary care in re-

leasing water from storage so as not to increase the natural flow in an amount that would cause or aggravate flooding. But it claims that it cannot be held liable for failing to achieve some affirmative flood-control objective that it was never assigned.

During the flood periods Utah Power released from Bear Lake no more water than was flowing into it. Had the storage system not existed, the area would have been flooded by the natural flow in the same way. The Landowners argue, however, that the damaging floods could have been prevented by proper management of the storage system—specifically, if more water had been released in earlier months Bear Lake would have had the capacity to store the quantity of water in the heavy spring runoff beyond what the downstream channel could handle. Utah Power denies that it was under any duty to take such affirmative action.

■ In general, the law does not require one person to act affirmatively to prevent harm to another unless he has himself brought about the condition which threatens the harm. Courts have often found an exception to this rule, however, when one person has voluntarily undertaken to assist another. He is then required to exercise reasonable care to protect the other's interests. Thus when a railroad voluntarily provides a flagman at an intersection, a relationship with motorists is established which creates a duty of care. In cases in which such liability has been found, the plaintiff's condition usually was worsened by his reliance on the defendant's action, though such detrimental reliance has not always been required. *See* Prosser, The Law of Torts § 56 (4th ed. 1971).

The line between "malfeasance" and "nonfeasance" is very thin and frequently almost imperceptible. The same conduct can often be described as either an act, for which there is liability, or a failure to act, for which there is none. Prosser has defined the issue of duty and liability in terms of the relationship between the parties and the nature of the plaintiff's dependence:

> The question appears to be essentially one of whether the defendant has gone so far in what he has actually done, and has gotten himself into such a relationship with the plaintiff, that he has begun to affect the interests of the plaintiff adversely, as distinguished from merely failing to confer a benefit upon him.

*Id.* at 340.

■ Utah Power insists that the storage system was not intended to be a flood-control project and that it was not held out as such. Its employees admitted, however, that Utah Power had in the past attempted to eliminate or minimize flooding by maintaining sufficient capacity in Bear Lake to handle the spring runoffs and that Utah Power employees had consulted with ranchers downstream, including the Landowners, concerning water-release and flood problems. Though perhaps not as its primary duty, Utah Power has voluntarily undertaken flood-control efforts in its operation of the Bear River-Bear Lake system. And whether intentionally for flood-control reasons or in furtherance of its other purposes, Utah Power has materially altered the water-flow patterns of the area by regularly storing the annual spring runoffs.

The Landowners have reasonably relied on such storage. As described above, they changed the nature of the farming operation on their lands after the water storage system was constructed in 1917. They replaced crops which depended on the spring runoff and which could survive flooding with crops which could not. It may be true that their lands would have flooded anyway had the storage system not been in existence, but in that case they would have still been growing the grasses and wild hays that might have survived the high water. In its installation and operation of the water storage system, Utah Power established a relationship in which the

landowners had to rely on Utah Power to control the spring runoffs.

Under these circumstances, Utah Power must carry the responsibility for avoiding damaging floods. We do not say that it is absolutely liable for flooding, but it must recognize the dependent position in which downstream ranchers have been placed and act accordingly to try, consistent with its other duties, to control floods. Utah Power, therefore, had a duty of care on which liability for negligent damage can be based.

### Foreseeability

If it has a duty of flood control, Utah Power then argues that it was not negligent since that duty could not require it to anticipate an unprecedented or extraordinary condition, the exceptionally high spring runoffs in 1971 and 1972.

■ The issue is properly put in terms of foreseeability. Negligence will not be found if the relevant conditions or risk of a given action could not reasonably have been anticipated at the time of the alleged negligent conduct. To be "unprecedented" or "extraordinary" is not necessarily to be "unforeseeable."

■ The Landowners contend that Utah Power should have known from snow reports as early as January that very heavy spring runoffs were in store for 1971 and 1972. Foreseeability is a question for the jury. The trial court properly instructed it on the requirement. We must presume that the jury concluded that the heavy runoff each year, though unprecedented, was reasonably foreseeable.

### Sufficiency of the Evidence

Utah Power argues that the expert testimony upon which the Landowners' case depended was inconsistent, inconclusive, and without adequate factual or scientific foundation. As a result, it is said, the Landowners failed to prove the necessary elements of negligence.

The challenge centers on Danny Fouladpour, a consulting engineer who testified extensively for the Landowners. He stated that if he had been making Utah Power's decisions starting in January 1971 with the knowledge available at the time, notably of the snow pack and its water content, he would have begun lowering the level of the lake as fast as possible. He outlined a plan which he said would have avoided flooding during either summer.

■ Once the court found that Utah Power owed a duty of care to the Landowners, it was for the jury to determine whether Utah Power fulfilled that duty. The jury decided that it did not. We cannot disturb that finding unless we find that the evidence was insufficient as a matter of law to support that verdict—that the evidence was such that no reasonable man would accept it as adequate to establish the existence of each fact essential to the liability.

■ Upon reviewing the record, and particularly Fouladpour's testimony, we conclude that the evidence presented by the Landowners was sufficient to support the verdict.

### Flood Easements

■ Utah Power held flood easements on the property of two of the Landowners. The trial court asked the jury for separate verdicts for these two but instructed it that despite the easements Utah Power "was not entitled to negligently flood those lands unnecessarily or to cause damage to those lands which reasonably could have been prevented." Instruction 20. Utah Power contends that this charge was erroneous and that it should be exempt from liability for flood damage to land on which it held flood easements. We find the instruction to be consistent with the holding of this Court in *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 668–69 (9th Cir. 1955), which held the same defendant potentially liable for negligence

in causing flood damage despite the existence of a flood easement.

Affirmed.